Good morning. If it pleases the court, I haven't been in this venue for a while. I'm usually at the lower level of the district court, but I'm happy to be back here arguing on behalf of Mr. Tillman. I was the actual trial attorney in this case, so I'm familiar with the facts which are driving the considerations of both the trial court and hopefully this court in rendering its decision. But what I want to address today, as you know from our briefs, there were five issues that we raised, but I want to concentrate on three. Number one, the sufficiency of the evidence for the cartridge that was found at the scene. Number two, Judge Nelson's failure to grant a mistrial, which we maintain was an abuse of discretion. And then number three, the admission of the Facebook evidence, and that tied into, I guess, my whole argument, my theory of the case, that those decisions impacted the sufficiency. And one of the things I wanted to start out, and the trial record in this case was an unusual case because there was a homicide. We know that. That's what I fought vigorously to keep out of the trial record, and I think that influenced the government's perspective in proceeding with the case, and it even impacted the brief that they filed because I was somewhat surprised when I looked at the brief. The first sentence in their brief talks about, now say right here, Mohammed Omar was murdered at 321 a.m., and it goes on to describe this homicide, which quite frankly was not part of the case. And I know they're taking that out of the PSR in this particular case, and I think, this is speculation on my part, similar to Sergeant Merton in this case, but speculation that by injecting this into the case, this terrible homicide at George Floyd Square on that night when Mr. Tillman was obviously there, that that may have impacted everybody's thought process in the case. But going back to the sufficiency of the evidence, you know what the situation is. What happened is that there was a shooting that night. There was a grainy video. That's one of the things that we argued about, what you could perceive from that or what the jury could perceive from that. There were a couple of muzzle shots. Is that right? Muzzle flashes? That's correct, Judge. When you look at that video, you can see flashes, but where they're actually coming from and who actually was responsible for them, I maintain, was in dispute. But yes, you can see that. And that's what Merton testified based on his training and experience. That appeared to be a gun being fired. That's what he said. And how, and is it, did everyone agree that there were three people there at that scene? Yes. That was not in dispute, and that was one of the things I argued as far as when that actually occurred about the other gentleman coming around the car, and that was part of the trial testimony. And if I understand it, the government's theory was that Mr. Tillman had shot himself. That was one of their theories. That was... Can you explain to me that evidence? As I read the evidence, it sounded like, well, they described it as a through shot, through the thigh, and that it was not a diagonal down. It was a horizontal shot. Is that correct? That's partially correct, Judge. What they did, they had the one individual who testified on the medical records in that, but there was no real expert testimony related to the final trajectory of that bullet. But I think that's what the government's theory was, that he shot himself in the leg. Was there any testimony, maybe you just answered this, but was there any testimony to indicate that that was possible? In other words, where would that gun have likely been located or angled for that bullet to go in the direction it did through the thigh? There was partial testimony for the trajectory of the bullet, as I recall, once it entered the leg. But as far as where it actually came from, from whose gun, of the three people that were there, that, I believe, is in dispute. And then going back, and this is what happened, and you know this from looking at the record, we're talking about a night where when they got there, there were actually 25 of these DCCs, which I wasn't even familiar with, I mean, generally speaking, but we know we're talking about the cartridges. And in this particular case, I managed to keep out the other 23 because that had to do with the homicide of Mr. Omar, where there was basically a shooting gallery long after Mr. Tillman was left to see. Was there any evidence of other shooting? In other words, was there any evidence presented at the trial that the casing that your client was charged with and convicted of possessing could have come from someplace else? Was there any other evidence? There was no direct evidence of that, but that's subject to argument because they could not connect that cartridge with anything that happened with Mr. Tillman. And that's part of what we argued, especially with Sergeant Merton, because what happened is that they got there, they basically were dealing with two of these DCCs, the one in the car, which they never even established interstate commerce, so that's out, and then the other one was the one that showed up 10 to 12 feet down the street. And Sergeant Merton testified, and this is in our brief too, he testified that normally if you fire a gun, the shell or the casing would be discharged to the right. And if Mr. Tillman is facing this way, that cartridge should not have gone down the street to the left 10 to 12 feet away. And that was the cartridge that they found. Was there any testimony of whether he was right or left-handed? No. And here's what happened, and then what happened is, and we know this on the forensic, in a lot of cases the government cited, but there was nothing. There was no forensics, there was no DNA, there was no gun, there was nothing to tie that cartridge to Mr. Tillman other than the grainy video and whatever that depicted, that's subject to argument, and then the testimony of Sergeant Merton. And that's why the cases, and there was a case when he was Chief Judge Smith in the Parker case, and I'll get to that, but what Sergeant Merton, the best he could say, and this was my actual question to him, so you can't tell us as you sit here today when it was actually placed there or ended up there, correct? And we're talking about the cartridge that was the subject of the conviction. He goes, right. And it's just speculation at this stage that it may have come from something that may have happened somewhere down the road, right? And he says, I have to speculate based on all of that evidence. And that's what we have here, is complete speculation without any forensic evidence to back it up. I want to touch on the mistrial too, and the other thing is the quote from Judge Smith's case, and I like this quote, and I think it's applicable in this particular case. It was another firearm case, it was Parker, and it said, the government alleged, but based on the record evidence, we think, quote, a conscientious mind would have to have entertained a reasonable doubt. And that's what my position is in this particular case on behalf of Mr. Tillman, that based on this record, they don't have it, they shouldn't have it, and the jury shouldn't have decided that way. Now, moving on to the mistrial. As I said, this whole homicide permeated the whole situation. We fought vigorously to keep the video out, and Judge Nelson did a good job. She kept out all of the shooting gallery testimony where this individual did end up meeting his demise, but Mr. Tillman was not involved in that. But then we had the questions right out of the gate from Sergeant Merson, well, was somebody shot? Was there a victim? And even sua sponte, Judge Nelson said, whoa, what's going on here? Basically. Counsel, I think there may have been some confusion in the record, but wasn't the judge's preliminary ruling rather limited in scope? That was the position the government takes, and we were arguing primarily about the video, Judge Strauss. And what happened is we were talking about, I was concentrating on getting this testimony, not testimony, the actual evidence of the shooting out. And that was one of the points the government raised, even though they apologized, they said it was inadvertent, they said, I guess their position is the actual order, and I think it was docket number 97. I have a copy of it here of what she actually said you could or could not do. I agree, there was probably some confusion on that. But there was, what we were trying to do, Judge, was keep the evidence of this person being a victim, keep the evidence that this person was shot by Mr. Tillman. That was not the charge. The charge was very naked and simple. It was possession of that DCC cartridge that presumably ended up 10 to 12 feet from the scene. And she gave a curative instruction. You saw that. She brought it up first. Then I followed up. I think I made two motions for a mistrial. And basically, she said, no, we're going to go ahead. I see my time is almost up. Facebook, that's in the briefs. I think you got a handle on that. I said it was old. It wasn't specifically directed to the conduct in this case, and it shouldn't have been admitted. And I'm going to reserve, I guess, my last minute, if I may, to sit down. Thank you. Good morning, Your Honors. I'm Matthew Forbes, and I represent the United States in this field. I'd like to focus on two of the issues that Mr. Tillman has raised today and in the briefing, and the first being the sufficiency issue. The sufficiency issue has two issues that are encompassed in it. The first is whether the jury reasonably could find that Mr. Tillman had fired a gun that night. And the second is, if he had fired a gun, was it reasonable to conclude that that DCC found on 38th Street had been in Mr. Tillman's possession? Taking those two issues in turn, there was plenty of evidence for the jury to conclude that Mr. Tillman had fired that gun. And it's the surveillance video in particular. Focusing on the muzzle flashes for a moment, there's two of them. But if you look at the second one in particular, Mr. Tillman's argument is that there's three folks in the video. It's hard to determine which of these three people may have been firing a gun. But in that second muzzle flash specifically, there's only one person. The muzzle flash comes right next to Mr. Tillman's body. It's right next to his arm, right next to where his leg was. Would that occur if, in fact, he was shot by someone else because it went so closely into his thigh? No, Your Honor, because the muzzle flash occurs next to the barrel of the gun. And so the person that's firing the gun, the muzzle flash occurs next to their hand, next to where the weapon is. If somebody else had fired the gun, the muzzle flash would occur next to them. Did the medical folks at the hospital check for anything on his hands? Was there any evidence that was gathered from the medical folks about that? Any sort of residue that would have indicated that he shot a gun? Your Honor, I don't believe so. However, Mr. Tillman left the hospital early against medical advice, which is another indication of his consciousness of guilt that he had done something illegal at 38th Street that night. There's also other evidence that he possessed the gun. It's not just these muzzle flashes. If you look at him, his demeanor as he moves around the back of the car and goes to start a fight with Mr. Tillman, he is confident. He is, as the government argued at closing, a man on a mission. Why? He was acting without fear because he possessed a firearm that night. Without the shell, without the casing that you've charged him with, could you have charged him with a possession of a firearm? Well, Your Honor, the firearm was not recovered. Right. So, I mean, among other things, the government would have had to have proved that the possession of the firearm affected interstate commerce. I'm not sure. But the government made the charging decision and did. Which goes to, you have no information at all about this gun, correct? Was there any testimony about whether the size from the video might have matched this particular casing? I don't believe there was, Your Honor. However, this is a fact pattern that commonly occurs in the Eighth Circuit and elsewhere. When the government chooses to charge firearm, illegal possession of ammunition, when a defendant is, can be known, when there's evidence suggesting the defendant fired a firearm and was involved in the shooting, but the firearm is not itself recovered. And I think that's right. It seems that those cases are a little bit different in that you've got an eyewitness that says, I saw so-and-so with a gun. I saw them shooting it. I understand we've got a video that's sort of an eyewitness, but it's pretty grainy and you really can't cross-examine a video. So, I think there's a bit of a distinction there. I agree, Your Honor. Those cases are different because the government proved that the defendant shot based on testimony. However, in many ways, the video makes this case stronger because those cases did not have video. And the defendant, Mr. Tillman, argues that this testimony was clear. It's not. If you go look at those cases closely... I'm sorry, he said, what did you say? The defendant argues that the testimony establishing that in those cases, establishing that the defendant had shot the firearm says it's clear. If you look at those cases closely, that's not true. In Kelly, the three victims that the government had hoped to use to testify to support that the defendant had fired a gun, they all recanted on the stand and actually offered exculpatory testimony. And it was other evidence that showed that the defendant had fired the gun. In Obey, there were witnesses who said the defendant was a shooter, but one witness testified that she might have made a mistake in identifying the defendant. And in Weaver, the defendant contended that there was conflicting testimony as to whether he was a shooter. So the point is that those cases are similar in that there was a dispute as to whether the defendant had actually shot a gun, but the jury found, yes, he had. And once they had made that conclusion, the next question was, if the defendant fired the weapon, could the jury reasonably conclude that the defendant possessed the DCCs found nearby? And the juries did in those cases, and the Eighth Circuit affirmed finding that that decision was reasonable. Counsel, I'd like to ask you about the Facebook images and messages. And my question is, in the context of this case, the facts of this case, what probative value did they have that would outweigh their rather obvious prejudice? Their probative value went to the defendant's intent and knowledge of how to acquire a firearm despite his prohibited status and his intent and knowledge to possess a firearm and ammunition. Those are the magic words. But under Old Chief, don't we have to look at prejudice in the context of what other evidence is available in the case? Yes, Your Honor. I think that's... I mean, it just seems to me it's really propensity evidence. I don't think so, Your Honor. The defendant says that the issue of mens rea was not disputed at trial, but that wasn't... I mean, the government still bore its burden of proving that the defendant had the mens rea. And the mens rea here is knowingly possessing, right? That's right, Your Honor. So what does the intent do? The intent and knowledge of possessing a firearm. But the jury doesn't have to find any intent, right? The mens rea is the knowing. That's right, Your Honor. But what's the intent doing? Well, there's also the intention of possessing a firearm despite its prohibited status. People that have felonies can't purchase a firearm at, say, Walmart. And the defendant must have intentionally come across this firearm, however he did so. However, Your Honor, that was not the only evidence. This was not a heavily relied upon piece of evidence, the Facebook evidence by the government. There were the defendant's confidence on the video, the muzzle flashes. Right after the shooting, he hobbles away immediately after that second muzzle flash as if he's been shot himself in the leg. He walks to the light pole where there's blood found on the ground. In between that muzzle flash and the light pole is the DCC. But those facts, he could have been shot by someone else, though, right? The hobbling away because he's been shot and getting to the lamppost? No, Your Honor, because that second muzzle flash occurs next to him, and he only starts hobbling after the second muzzle flash and not before. Your Honor, there's one other thing I want to address the defense. Mr. Shia talked about the DCC, where it could have gone, the trajectory of it. There was testimony by Mr. Merton at trial that one thing that can happen is a DCC can be caught in clothing and it can be transported, it can bounce off of all sorts of other things. And while Mr. Merton couldn't say exactly what happened, the jury had that testimony available to it and it reasonably relied on it, including that this DCC found in Mr. Tillman's path had been possessed by him. On the, and I see I only have one more minute, I've got one more minute. On the issue of the mistrial, the first two comments came in, the references to being shot and to the crime scene, and those came in before the judge had clarified her order. And in the written order, it pertained only to graphic evidence, the video evidence and the images. After she clarified the order, the only comment was this comment about being a victim, which was a perfectly reasonable comment in light of the fact there was no dispute that Mr. Tillman had at the very least physically assaulted Mr. Omar. And in the government's view, that allowed for that testimony to come in. Immediately afterwards, the government apologized profusely and the court on the record stated, I don't think that there's, I believe that the court said, I think this was just a misunderstanding. I don't doubt that you did this unintentionally. Thank you, your honors. And subject to any questions that you have, I'll sit down. Thank you. I really don't think I have to say much because nothing he said, in my opinion, contradicts the arguments I've made ahead of time. As you noted, Justice Kelly, is that the four cases they cited on the issue of identification, they had four people, or in each case, everybody was saying there was direct testimony about the shooter. And I agree about propensity evidence, especially when you're dealing in a case like this, where so much of it is premised on rank speculation. And that's where it unfairly tilted the scales of justice against Mr. Tillman. Because obviously, if you see somebody brandishing a gun, even though it's 19 months earlier, saying I know how to get a gun, or I'm going to bring my gun, that is definitely prejudicial. And I'm not saying, I'm making the blatant obvious. But in this type of case, it's even exacerbated because it was not a case of direct testimony. It was totally circumstantial other than the video and its speculation. And I thank you all. Thank you, counsel.